**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MARCELINO SOLIS, : | |
|     Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 1:09-CV-3293-RWS |
| : | |
| THE TACO MAKER, INC., et al., : | |
|     Defendants. : | |

## ORDER

### Background

This case started out as a securities/unjust enrichment lawsuit between Marcelino Solis (Solis) and The Taco Maker, Inc. (TTM). TTM responded to Solis' complaint by filing various counterclaims along with a third party complaint against Solis' lawyer, Shane Stogner and Mr. Stogner's firm, Busch, Slipakoff, & Schuh, LLP (collectively, Stogner).

The parties' versions of the facts differ, but the divergence of those narratives is not material to the issues that remain to be resolved. Everyone agrees that Solis owns a company that manufactures tortillas and that Solis sought to supply TTM's restaurant chain with tortillas. The parties further agree that in 2008, certain of TTM's shareholders were in a dispute regarding control of the company. Solis agreed to help TTM's CEO gain control of the company by purchasing the shares of a major shareholder named Lausell. After that share purchase was complete, TTM's CEO and

AO 72A
(Rev.8/82)

Solis would have sufficient shares to control the company, the CEO would be able to run the company as he saw fit, and Solis would be able to direct orders for tortillas to his company.

The parties began negotiating a share purchase agreement under which Solis would obtain Lausell's shares. During this time, Solis told TTM's CEO and its lawyer that Stogner was a good lawyer and that he should handle TTM's corporate and securities law work once the share purchase deal was consummated. TTM's CEO agreed that Stogner would perform legal services for TTM. After TTM's CEO asked Stogner to use his banking contacts to secure financing for TTM, Stogner sent TTM an engagement letter. The letter was never signed and Stogner never contacted any banks on TTM's behalf. Sometime later, after the share purchase deal had fallen through, TTM's attorney asked Stogner for assistance regarding certain real estate leases. Stogner sent another engagement letter that also was never signed, and Stogner did not assist TTM regarding the leases.

According to TTM, Solis entered the share purchase agreement and made a down payment of $125,000.00 to secure performance of the agreement that ultimately would have required Solis to pay $750,000.00. TTM further contends that, after Solis made this initial payment, his bank failed, and he was unable to secure credit to complete the deal.

AO 72A
(Rev.8/82)

There are several problems with TTM's version of events, however.[1]  First it is clear that the parties never completed or executed the share purchase agreement.  Second, the record – notably TTM's CEO's deposition testimony, [see Doc. 209 at 74] – demonstrates that, before he sent the $125,000.00, Solis informed TTM's CEO that he could not raise the necessary money to purchase the Lausell shares.  Finally, when Solis sent the $125,000.00, that money went directly into TTM's CEO's personal bank account and not to Lausell.  While TTM contends that Lausell ended up with those funds, TTM's CEO testified that he used the funds to purchase the shares for himself because TTM's bank would permit only the TTM CEO to purchase the Lausell shares.  [See id.].  Clearly, whatever deal was done was not the one contemplated by the share purchase agreement that the parties were negotiating.

According to Stogner, Solis had to back out of the share purchase deal because his bankers would not agree to provide credit for the transaction.  However, because Solis still wanted to secure a contract to sell tortillas to TTM, he agreed to send the $125,000.00.  When he sent the money, Solis had no idea what he was getting in return aside from a vague idea that he would either receive orders for tortillas or an ownership interest in TTM.

---

[1] This is not the only example of TTM misconstruing (at best) or misrepresenting (at worst) the facts of this case.

3

After some time passed and Solis did not receive any orders for tortillas, he – through Stogner – inquired what he had purchased with his $125,000.00. The record demonstrates that TTM's representatives responded to that question with a variety of different answers. At one point, TTM told Solis that he had purchased a one percent ownership interest which later turned out not to be true. Stogner wanted TTM to either provide a stock certificate to show what Solis had purchased or sign a promissory note to pay Solis back. TTM's CEO indicated that he would pay the money back, and the parties began to negotiate a promissory note, but TTM representatives never signed a note.

Solis then brought this action against TTM, another company and TTM's CEO to recover his $125,000.00. Solis' complaint was filed by Stogner and asserted claims of common law fraud, sale of unregistered securities, unjust enrichment, securities fraud, conversion, and attorneys fees. In response, TTM filed various counterclaims and a third party complaint against Stogner, asserting claims of breach of fiduciary duty, an entitlement to declaratory relief, legal malpractice, and for attorney fees. The original dispute between Solis and TTM, including all counterclaims, has been settled by the parties, and it appears that Solis is now selling tortillas to TTM. The only matter left for this Court to adjudicate is TTM's third party suit against Stogner.

TTM filed a motion to disqualify Stogner, [Doc. 9], and this Court, after a hearing, denied the motion based on the finding that there was no conflict of interest and that TTM had not disclosed confidential information to Stogner, [Doc. 25]. Stogner then filed a motion to dismiss the third party complaint, [Docs. 23, 29], which this Court denied, [Doc. 43], except with respect to TTM's claim for injunctive relief.

Both parties have now filed motions for summary judgment. [Docs. 154, 191]. In addition, TTM has pending before this Court a motion for sanctions, [Doc. 194], a motion to strike, [Doc. 210], and a motion for leave to file an errata sheet, [Doc. 212].

## **Allegations in the Third Party Complaint**

In its third party complaint, TTM asserts that Stogner did the following: While Solis was in the process of attempting to secure an ownership interest in TTM, Stogner was designated by Solis to negotiate on Solis' behalf. Stogner gave one of TTM's major shareholders an offer to purchase twenty percent of TTM for two million dollars. Stogner then refused to provide audited financial statements of Solis' company as well as a letter of recommendation from Solis' bank for presentation to TTM's bank. Stogner next obtained copies of TTM's corporate formation documents. While Stogner was representing Solis in negotiating a stock purchase agreement on Solis' behalf, Solis requested that Stogner be allowed to represent TTM's interests in the

United States.  Stogner sent TTM an unsigned form of engagement letter.  Stogner wired $125,000.00 to TTM on Solis' behalf.  After wiring the money, Stogner filed a lawsuit on Solis' behalf which contained material misrepresentations.

In the surviving counts of the third party complaint, TTM claims in Count I that, based on the foregoing facts, Stogner was TTM's legal representative and breached a fiduciary duty to TTM by filing Solis' lawsuit.  In Count III, TTM claims that Stogner's malpractice and/or negligence "in implementing contract formalities and [his] dual representation" have caused a dispute to arise between Solis and TTM, forcing TTM to defend the action brought by Solis.  Count IV asserts a claim for attorneys fees, which, of course, relies on TTM establishing Stogner's liability in either Counts I or III.

## Discussion

### Summary Judgment

Under the Federal Rules, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the

basis for its motion." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). However, this Court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

AO 72A
(Rev.8/8
2)

Discussion of The Parties' Arguments

At the outset, this Court notes that TTM's claims generally lack substance. Reading TTM's rather exaggerated allegations in its motion for summary judgment might indicate, at most, that Stogner may have exercised poor judgment. However, a review of the record indicates that Stogner has done nothing wrong. Notably, the evidence to establish an attorney/client relationship or a fiduciary relationship between Stogner and TTM is entirely unconvincing. The record demonstrates that all parties agreed that Stogner would provide legal services to TTM only after Solis had completed the purchase of the Lausell shares. That transaction never took place. This Court also found earlier that TTM did not supply confidential information to Stogner and TTM has done nothing to convince this Court otherwise.

Further, there is no evidence, outside of vague statements by TTM representatives, that Stogner did any legal work for TTM at all. TTM's CEO testified in his deposition that he was not involved in the details of what Stogner and the TTM attorney were doing but that: "I was under the understanding that [Stogner] was working for us, making sure that we can – because [Solis] asked for it – that we can – that we can put together what we were – we wanted, the both of us." [Doc. 209 at 64]. The context of that statement, however, was that Stogner was working in furtherance

of Solis' purchase of the the Lausell shares.[2] While that transaction would have benefitted the TTM CEO, it cannot be reasonably believed that Stogner was working as TTM's lawyer in negotiating the share purchase agreement on Solis' behalf, especially considering the fact that Stogner was negotiating against TTM's lawyer.[3]

This Court concedes that there was some discussion regarding whether Stogner would help with TTM's recapitialization and would clean up TTM's corporate records. However, all of those plans were conditional on Solis' purchase of shares, and nothing about those statements creates an attorney/client relationship until the lawyer actually begins his representation.

---

[2] The TTM lawyer similarly testified when asked about how TTM was relying on Stogner as an attorney: "Once an offer was made from [a TTM shareholder] – that's written in there – [TTM's CEO] told [Stogner] 'Well, [Stogner], make sure – take care that this happens.' And that was the – assigned by so much as him as well as the shareholder to be." [Doc. 156 at 42]. The "shareholder to be" in that statement is Solis. In other words, the testimony is that the CEO was simply telling Stogner to get Solis' share purchase deal done.

[3] Although a third party beneficiary claim does not appear in its third party complaint, TTM mentions (with little specificity) in its summary judgment motion that TTM was a third party beneficiary of Stogner's work. However, as noted, the Lausell share purchase deal fell through because Solis did not have the funds to complete it, and there is nothing in the record that indicates that Stogner could be held responsible for Solis' decision to send $125,000.00 to TTM's CEO. As such, there is no basis upon which to conclude that Stogner did anything to give rise to third party beneficiary liability.

Most telling, however, is TTM's lawyer's testimony in response to the question, "Does Taco Maker contend that Mr. Stogner did anything for Taco Maker in the summer of 2008?" The following colloquoy ensued:

> A. The part that was added for him to evaluate, in addition for him to prepare and secure the documents that he would evaluate in the proper manner of the proper procedures to be able to accomplish these documents in his expertise.
>
> Q. I don't understand that at all. Can you tell me what Mr. Stogner did for Taco Maker in 2008?
>
> A. Protecting the documents – production of the documents, in other words, providing that the transactions would be done in the proper manner so that it would not suffer the transactions that were done with [Lausell]. That is why – that's why all the drafts in the stock purchase agreement were coming from him.
>
> Q. You refer to documents. What documents are you referring to?
>
> A. The stock, there was – there was some documents, in other words, the certificates of corporations, the bylaws of the corporations. And all that is established in a specific form and manner and with respect to how stocks can be sold to third parties and/or in between the existing stockholders and/or the corporation. Thus, being – not being an expert in corporations, even though I can read and I know what the document says, some transaction documents needed to be formed. And in one manner [Solis] put a deposit in his confidence of [Stogner] so that would not happen to him what occurred in the previous transaction. And he demanded that [TTM's CEO] – he would designate him to be the person that was going to do that transaction. And I was going to be reviewing all these documents next to him, all these documents. That part up to the point of July, that was paid by [Solis]. But when the second phase starts, of the refinancing, that's when [Solis] says, "Because I understand that you need to be contracted directly by [TTM] because I'm not going to be continuing to pay for this big buffet of the offer for – with regards to the

AO 72A
(Rev.8/82)

>   refinancing, because the one that's going to receive all the benefits is going to be [TTM] and not [Solis].

[Doc. 156 at 51-53].

Reading interpretively – and giving the TTM lawyer the benefit of the doubt – he merely states that, leading up to the share purchase deal, Stogner was interpreting TTM's corporate formation documents to see if the deal could be done, and, after the deal was completed, Stogner would help TTM refinance its debt. This clearly indicates that Stogner did, in fact, nothing in the way of legal services for TTM. Interpreting the TTM corporate documents was part of his duties to Solis. Further, as repeatedly stated, the share purchase deal was never consummated. In other words, the condition precedent to Stogner providing legal services to TTM was never met.

TTM considers the engagement letter that Stogner sent to be a significant factor in its favor. However, this Court finds the opposite to be true. The record reveals that TTM's CEO asked Stogner to contact banks on TTM's behalf. Stogner responded by sending an engagement letter. The letter was never signed and Stogner did not contact any banks. Then TTM's lawyer asked Stogner about a lease issue, and Stogner sent another engagement letter. That letter was never signed, and Stogner did no work on the lease issue. The obvious interpretation of these facts is that Stogner was willing to do some work for TTM, but only after he received a signature on an engagement letter, which never happened.

11

AO 72A
(Rev.8/82)

In summary, this Court concludes that there was no attorney/client relationship between Stogner and TTM. This Court further concludes that, in the absence of an attorney/client relationship, Stogner had no fiduciary duty to TTM. Indeed, it is unreasonable for TTM to have believed that a fiduciary relationship existed. Given the facts that Stogner entered the scene as Solis' attorney, that Stogner was Solis' son-in-law (which TTM's CEO well knew), and that Stogner was negotiating the share purchase agreement in opposition to TTM's lawyer, any reasonable person would have concluded that Stogner's duties rested with Solis alone. As such, Stogner is entitled to judgment in his favor.

### TTM's Motion for Sanctions

TTM's motion for sanctions, [Doc. 194], is based upon the unsupportable proposition that merely filing a lawsuit is a sanctionable act if you cannot prove every allegation in your complaint. In this case, Solis sent $125,000.00 to TTM and got nothing much in return. He attempted to negotiate a deal whereby TTM would either issue stock certificates in Solis' name or TTM would sign a promissory note for $125,000.00. When TTM refused, Stogner filed suit on Solis' behalf, which was a perfectly reasonable reaction. While some of the lawsuit's theories of relief might be somewhat farfetched, this Court has carefully reviewed the record in this matter and

AO 72A
(Rev.8/82)

has concluded that Stogner has not committed a sanctionable act. As such, TTM's motion will be denied.

## Conclusion

For the reasons stated,

**IT IS HEREBY ORDERED** that Stogner's motion for summary judgment, [Docs. 154], is **GRANTED** and the Clerk is directed to enter judgment in favor of Stogner and Busch, Slipakoff, & Schuh, LLP on all of TTM's third party claims. TTM's motion for summary judgment, [Doc. 191], and its motion for sanctions, [Doc. 194], are **DENIED**. For good cause shown, TTM's motion for leave to file an errata sheet, [Doc. 212], is **GRANTED**, rendering TTM's motions to strike, [Doc. 210], moot and, as such, **DENIED**.

The Clerk is directed to close this action.

**IT IS SO ORDERED,** this   27th   day of August, 2013.

_____
**RICHARD W. STORY**
United States District Judge